IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Magistrate Judge Boyd N. Boland

Civil Action No. 10-cv-00385-WJM-BNB

SBM SITE SERVICES, LLC, an Oregon limited liability company,

Plaintiff,

v.

JOHN GARRETT, an individual, and
CROWN BUILDING MAINTENANCE, INC., d/b/a Able Building Maintenance, d/b/a Able
Services, d/b/a Able Acquisition Corp.,

Defendants.

_____

**ORDER AND PRELIMINARY INJUNCTION**
_____

This matter arises on (1) the **Plaintiff's Motion for Preliminary Injunction** [Doc. #

173, filed 1/12/2011] against defendant John Garrett ("Motion for Injunction: Garrett") and (2)

the **Plaintiff's Motion to Preliminary Injunction Against Defendant Crown Building**

**Services, Inc., dba Able Services** [Doc. # 259, filed 3/2/2011] ("Motion for Injunction: Able").

The parties have consented to my determination of the motions for preliminary injunction

pursuant to 28 U.S.C. § 636(c)(1).  See Plaintiff's Consent [Doc. # 271]; Defendants John

Garrett's and Able's Joint Notice to the Court Consenting [Doc. # 274].  I held a day-long

evidentiary hearing on the motions on March 25, 2011, which continued onto March 30, 2011.  I

GRANT the motions and issue a preliminary injunction, as specified below.

I.

Plaintiff SBM Site Services, LLC ("SBM"), is in the janitorial services industry.

Defendant Crown Building Maintenance, Inc., d/b/a Able Building Maintenance ("Able"), is in

the same business and is a direct competitor.  Defendant John Garrett ("Garrett") formerly was

an employee of SBM for sixteen years, rising ultimately to the position of Senior Vice President-

Chief Business Development Officer.  In January 2010, Garrett resigned from SBM and went to

work for Able in a similar position, serving as executive vice president with responsibilities

including the generation of business.  SBM alleges that Garrett took with him "tens of thousands

of SBM's confidential documents" and that he "literally stole from SBM the blueprint to grow

Able's facilities services business by stealing SBM's processes, concepts, strategies, pricing and

confidential information."  Motion for Injunction: Garrett [Doc. # 173] at pp. 9-10.  SBM seeks a

preliminary injunction: (1) enjoining Garrett and Able from possessing or using SBM's

confidential and trade secret information; (2) enjoining Able from any further use or review of

materials obtained by Garrett from SBM; (3) requiring Garrett and Able to retrieve any

documents containing or derived from SBM's confidential and trade secret information; (4)

requiring Garrett to return all of SBM's confidential and trade secret information and to certify

that neither he nor Able has any further access to that information; (5) enjoining Able from any

further access to materials obtained by Garrett from SBM; and (6) "requiring Able to take all

necessary steps to ensure that all documents or electronic files Garrett obtained during his

employment with SBM, including but not limited to any documents or electronic files that

originated at SBM but have since been modified by Able's employees, are promptly preserved

and delivered to Able's counsel, permanently removed from any Able server, laptop, or other

electronic device to which any Able agent or employee has access, and quarantined so as to

ensure that no Able agent or employee has any further access to any such documents or

electronic files, or modifications thereto. . . ."  Motion for Injunction: Garrett [Doc. # 173] at p.

15; Motion for Injunction: Able [Doc. # 259] at pp. 14-15.

To obtain a preliminary injunction, SBM must show: (1) a substantial likelihood of success on the merits; (2) irreparable harm if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause to the opposing party; and (4) the injunction will not adversely affect the public interest. General Motors Corp. v. Urban Gorilla, LLC, 500 F.3d 1222, 1226 (10th Cir. 2007). "In general, 'a preliminary injunction is an extraordinary remedy; it is the exception rather than the rule.'" Id. (quoting O Centro Esperita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 976 (10th Cir. 2004)(en banc, per curiam)).

Three forms of preliminary injunctions are disfavored--(1) preliminary injunctions that disturb the status quo; (2) preliminary injunctions that are mandatory as opposed to prohibitory; and (3) preliminary injunctions that afford the movant substantially all the relief that may be recovered at the conclusion of a full trial on the merits--and must be "more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary." O Centro, 389 F.3d at 975. The moving party seeking a disfavored form of preliminary injunction must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms. . . ." Id. at 976; accord General Motors, 500 F.3d at 1226.

A preliminary injunction that alters the status quo is disfavored because "it goes beyond the traditional purpose for preliminary injunctions, which is only to preserve the status quo until a trial on the merits may be had." SCFC ILC, Inc. v. Visa USA, Inc., 936 F.2d 1096, (10th Cir. 1991), overruled on other grounds by O Centro Esperita Beneficente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 976 (10th Cir. 2004)(en banc). Mandatory injunctions are disfavored

because they are "more burdensome than prohibitory injunctions because they affirmatively require the nonmovant to act in a particular way, and as a result they place the issuing court in a position where it may have to provide ongoing supervision to assure that the nonmovant is abiding by the injunction." Id. Finally, a preliminary injunction which awards essentially full relief is disfavored because it is "similar to the 'Sentence first-Verdict Afterwards' type of procedure parodied in Alice in Wonderland, which is an anathema to our system of jurisprudence." Id.

## II.

SBM argues that the preliminary injunction which it seeks is not among the disfavored forms, but will merely "preserve the original status quo placing the parties back in the position they were in before Garrett stole SBM's trade secrets and accepted employment with Able." Motion for Injunction: Garrett [Doc. # 173] at p. 11; see Motion for Injunction: Able [Doc. # 259] at p. 9. Garrett and Able argue that the requested injunction is disfavored. According to Garrett, the injunction sought is both mandatory and would afford SBM all the relief it could recover at the conclusion of a full trial on the merits. Garrett's Response [Doc. # 234] at p. 4. Able argues that "most of the relief requested by SBM falls into the disfavored categories of disturbing the status quo and/or mandatory injunctions." Able's Opposition [Doc. # 302] at p. 4.

"In determining the status quo for preliminary injunctions, [the] court looks to the reality of the existing status and relationship between the parties and not solely to the parties' legal rights." Schrier v. University of Colorado, 427 F.3d 1253, 1260 (10th Cir. 2005). The status quo has been described as "the last uncontested status between the parties which preceded the controversy until the outcome of the final hearing" or the "last peaceable uncontested status

4

existing between the parties before the dispute developed." Id. (internal quotations and citations omitted).  In this case, the "last peaceable status" existing between the parties was prior to February 1, 2010, when Garrett went to work for Able and took with him SBM's documents and information.  Transcript of Proceedings, March 25, 2011 [Doc. # 327] (the "3/25/2011 Trans.") at p. 23 line 22 through p. 24 line 9.  Consequently, I find that the requested preliminary injunction, seeking to prevent Garrett, in his new employment with Able, and Able, Garrett's new employer, from possessing, accessing, or using any of SBM's trade secrets or confidential information would preserve, and not disrupt, the status quo.  See Xantrex Technology Inc. v. Advanced Energy Industries, Inc., 2008 WL 2185882 at *14 (D. Colo. May 23, 2008)(finding that an injunction which restrains a company from using trade secrets allegedly brought to it by a disloyal former employee of a competitor returns the parties to the status quo before the controversy); accord Schrier, 427 F.3d at 1260 (finding that the last peaceable status between the parties existed prior to the removal of a department chair from that position).

This finding is supported by the fact that Garrett signed a Confidentiality Agreement which required him to "hold in confidence and to not disclose any [SBM] business, including but not limited to: accounting records, employee records, customer lists and contracts, specialized training information, processes and operations, or any other business policy that is of a Confidential nature, to any customer, vendor, competitor or other person or persons. . . ." Confidentiality Agreement [Exh. 58].[1]

---

[1]Garrett initially invoked his Fifth Amendment right against self-incrimination when asked whether he had signed the Confidentiality Agreement, 3/25/2011 Trans. [Doc. # 327] at p. 42 lines 15-21, but later stated that the signature on the Confidentiality Agreement "looks like" his.  Id. at p. 45, lines 1-3.  I invoke a negative inference based on Garrett's assertion of his Fifth Amendment right, taken together with Garrett's admission that the signature on the

An injunction is mandatory if it "affirmatively require[s] the nonmovant to act in a particular way," thus requiring ongoing supervision by the issuing court.  <u>SCFC</u>, 936 F.2d at 1099.  I agree with the defendants that "[m]ost of the relief requested by SBM falls into the disfavored categor[y] of . . . mandatory injunctions."  Able Opposition [Doc. # 302] at p. 4.  In particular, SBM prays for the following injunctive relief against Able:

> (1) enjoining Able from possessing or using SBM's confidential or trade secret information . . .;

> (2) enjoining Able from any further use or review [of] any documents or electronic files obtained by Garrett from SBM . . .;

> (3) requiring Able to retrieve from any and all third parties who have received such information any and all documents or information constituting, containing, or derived from SBM's confidential and trade secret information;

> (4) requiring Able, through one of its officers, to set forth in detail, in a declaration, the steps it took to comply with item number 3;

> (5) enjoining Able from any further access to documents or electronic files obtained by Garrett from SBM. . . .  This includes preventing access to Dropbox, as well as any other locations where such documents or electronic files are located;

> (6) requiring Able to take all necessary steps to ensure that all documents or electronic files Garrett obtained during his employment with SBM, including but not limited to any documents or electronic files that originated at SBM but have since been modified by Able's employees, are promptly preserved and delivered to Able's counsel, permanently removed from any Able server, laptop, or other electronic device to which any Able agent

---

Confidentiality Agreement "looks like" his, and conclude that Garrett signed the Confidentiality Agreement.  <u>See</u> <u>Baxter v. Palmigiano</u>, 425 U.S. 308, 318 (1976)(allowing a negative inference against a party in a civil action when they refuse to testify "in response to probative evidence offered against them"); <u>United States v. Stelmokas</u>, 100 F.3d 302, 311 (3d Cir. 1996)(noting that "as long as there was independent evidence to support the negative inferences beyond the invocation of the privilege against self-incrimination, the inferences could be drawn").

or employee has access, and quarantined so as to ensure that no
Able agent or employee has any further access to any such
documents or electronic files, or modifications thereto; [and]

(7) requiring Able, through one of its officers, to set forth in detail,
in a declaration, the steps it took to comply with item number 6. . .
.

Motion for Injunction: Able [Doc. # 259] at pp. 14-15.  Similar injunctive relief is sought against

Garrett, including:

(1) enjoining Garrett from possessing or using SBM's confidential
and trade secret information . . .;

(2) requiring Garrett to retrieve from Able, or any third party, any
and all documents or information constituting, containing, or
derived from SBM's confidential or trade secret information;

(3) requiring Garrett to set forth in detail, in a declaration, the steps
he took to comply with item number 2; [and]

(4) requiring Garrett to return all of SBM's confidential and trade
secret information to SBM and to certify by declaration that
neither Garrett nor Able has any further access to any such
information. . . .

Motion for Injunction: Garrett [Doc. # 173] at p. 15.

        Much of the relief sought is obviously mandatory--requiring Able and Garrett to retrieve,

prevent access, preserve and deliver, and set forth their actions to comply.  Even that relief

which at first blush appears to be prohibitory--enjoining Able and Garrett from "possessing or

using," "further use or review," or "further access"--is actually mandatory, because it requires

the defendants to identify, retrieve, and return or quarantine SBM's confidential and trade secret

information, which are affirmative actions that may require ongoing court supervision.  See Tom

Doherty Assocs. v. Saban Entertainment, Inc., 60 F.3d 27, 34 (2d Cir. 1995)(noting that "many

mandatory injunctions can be stated in seemingly prohibitory terms").

I find that the injunction sought is overwhelmingly (if not exclusively) mandatory in nature and constitutes a disfavored form of preliminary injunction.[2]  Consequently, I must more closely scrutinized the evidence "to assure that the exigencies of the case support the granting of a remedy that is extraordinary,"  O Centro, 389 F.3d at 975, and SBM must "make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms. . . ."  Id. at 976; General Motors, 500 F.3d at 1226.

III.

A.  Irreparable Harm

SBM brings nine claims against Garrett and four claims against Able.  It asserts a claim for misappropriation of trade secrets against both defendants, and it seeks a preliminary injunction against the defendants based on its trade secret claim.

Colorado has adopted the Uniform Trade Secrets Act at section 7-74-101 et seq., C.R.S. Section 7-74-103, C.R.S., provides that "[t]emporary and final injunctions including affirmative acts may be granted on such equitable terms as the court deems reasonable to prevent or restrain actual or threatened misappropriation of a trade secret."

As the court noted in Xantrex, 2008 WL 2185882 (D. Colo. May 23, 2008), I must consider the irreparable harm factor independently of the Colorado Uniform Trade Secrets Act because "'a showing of probable irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction'" and "'the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be

---

[2]In O Centro, Judge Murphy noted in his concurrence that "[a]lthough mandatory injunctions also *generally* alter the status quo, that is not always the case."  389 F.3d at 979 (original emphasis).

considered.'" Id. at * 15 (quoting Dominion Video Satellite, Inc. v. Echostar Satellite Corp., 269 F.3d 1149, 1260 (10th Cir. 2001)).

Irreparable injury exists "when the court would be unable to grant an effective monetary remedy after a full trial because such damages would be inadequate or difficult to ascertain." Dominion Video, 269 F.3d at 1156.  The injury must be both certain and great and not merely serious or substantial.  Prairie Band of Potawatomi Indians v. Pierce, 253 F.3d 1234, 1250 (10th Cir. 2001).

The facts presented here are substantially the same as those in Xantrex.  There, as here, one company (AE) hired a high level employee (Mr. Thompson) from its direct competitor (Xantrex).  The court found that:

> Mr. Thompson's role at Xantrex exposed him to all of Xantrex's product development plans and processes.  Further, Mr. Thompson was the primary person responsible for the engineering of solar inverters.  Mr. Thompson was therefore privy to the confidential information about why certain features were offered on Xantrex inverters and why others were not.  Much of this information came directly from Xantrex experience in the industry and confidential consultation with customers.

Id. at *3 (internal citations omitted).

Similar to the findings made in Xantrex, I find here that SBM has established that it faces a substantial likelihood of irreparable harm.  The value of SBM's confidential information and trade secrets to Garrett and Able is not directly compensable with monetary damages.  Garrett's position at Able is essentially identical to the one he held at SBM, and he has taken with him SBM's trade secret information for use in that competing position.  As a result, SBM faces the substantial likelihood that it will lose market share and customer business.  It is difficult to calculate with any precision in monetary terms the damage to SBM in the competitive

marketplace resulting from Garrett and Able's use of SBM's trade secrets.

Garrett and Able here, like AE in the <u>Xantrex</u> case, argue that SBM cannot point to a single lost customer, lost sale, or loss of position in the marketplace as evidence that SBM has not suffered any harm.  The court in <u>Xantrex</u> rejected those arguments, stating:

> Simply because there is no current evidence that customers have been lost, or sales lost, does not mean that irreparable injury is lacking. . . . [I]t is sufficient that the plaintiff has demonstrated that such loses are likely to occur.

<u>Id</u>. at *16.

Here, as the court did in <u>Xantrex</u>, I find that SBM has presented sufficient evidence that irreparable harm is likely to occur.  In particular, there is overwhelming evidence that in the weeks immediately preceding his resignation from SBM, Garrett had his secretary compile and send to him electronically thousands of pages of SBM's documents, including particularly its "pipeline."  According to Charles Somers, SBM's president and CEO:

> A pipeline is a future growth potential for SBM.  And so pipeline is generated on an ongoing basis, really, by three strategies.  One, our sales team goes to the different regions that we conduct business and contact potential clients, and it identifies those clients as high probability clients for SBM working in the facility space.
>
> The second area is when we have existing clients who notify our management team that we will be--they'll be going out to bid.  Then we identify that, and we provide that information on the pipeline as well.
>
> And the third area is, out of our 200-plus or so managers, our site managers through the 44 states, they identify all their existing customers potential bidding opportunities at their existing sites and at their existing regions.  That all flows up into the sales chain, that flows up into the--in this case would have been Todd Cordell and John Garrett, and then to the senior team.

3/25/2011 Trans. [Doc. # 327] at p. 177 line 20 through p. 178 line 16.  The evidence shows that

Able, through Garrett, possesses both SBM's internal pipeline of existing customers and external

pipeline of potential customers.  Id. at p. 183 lines1-10.  The pipeline identifies, among other

things, SBM's customers and potential customers; the identities of the customer contacts

including names, telephone numbers, and email addresses; contract dates; the customers' market

areas, nature of space, and specific services and special skills required; the current service

providers; space in square feet; projected monthly revenues; and an analysis of "success

indicators."  Id. at p. 188 line 2 through p. 189 line 25; Exhs. 63, 64, 66, 67, 71, 124, and 149.

See Hertz v. Luzenec Group, 576 F.3d 1103, 1113 (10th Cir. 2009)(holding that lists of both

actual and prospective customers may be trade secrets).  The pipeline also reveals SBM's

analysis of the "trend where the market is going, where that customer is going," 3/25/2011

Trans. [Doc. # 327] at p. 184 lines 10-13, as well as cost analyses and actual pricing, which

could allow Able to undercut SBM's bids.  Id. at p. 185 lines 5-12.

The pipeline is an ongoing effort, and is constantly updated.  Id. at p. 206 lines 20-25.  It

has taken SBM thousands of man-hours to develop.  Id. at p. 180 lines 6-14.

In addition to the pipeline, the evidence establishes that Garrett and Able have access to

internal SBM pricing documents.  Id. at p. 148 line 7 through p. 149 line 8; Exh. 103.  The

pricing documents include detailed information about SBM's process for reviewing a customer's

needs and preparing a bid.

The evidence shows, and I find, that Garrett and Able's access to and use of SBM's

pipeline and pricing documents has given and will continue to give Garrett and Able an unfair

advantage in the marketplace.  Again, in Mr. Somers' words:

> [W]e put so much effort and time into this strategy.  And, again, its
> more than just the pipeline.  There's a lot of information that goes

with the pipeline.  What the gap analysis would be, what the
strategy is to approach that customer.  Is it a quality, cost, safety,
compliance, depending where that space--that customer operates.
But giving that to a competitor gives them a leg up.

 *   *   *

[T]hey stole the blueprint to how we've grown over the years.  I
mean, the trial and errors, the gap, the strategies that we've
employed now exist within the Able team.  And so that
information has been disseminated throughout the Able
organization.  And so every day we're competing against ourselves
against Able.

Id. at p. 181 lines 10-21; p. 191 lines 4-21.[3]

SBM has shown not only the likelihood of irreparable harm in the future, but also

presently existing harm.  According to Mr. Somers:

[T]he first 30 days after [Garrett's] departure Able was at--in
Colorado which we never saw Able before.  They were at the
Avaya site. . . . [T]hey were at Lockheed-Martin.  They were at
Kaiser.  Next you know they're at Baxter Health.  And, again,
we've never ever seen Able before.  And, quite frankly, the bids
that now we're seeing through the discovery process they're
utilizing our marketing data and, quite frankly, we believe our
financial information.  So, yes, it's--we're competing against
ourselves.

Id. at p. 190 lines 1-13.

In addition, SBM worked for nearly one year to obtain a preferred supplier relationship

with Jones Lang LaSalle ("JLL"), one of the largest real estate management companies in the

world.  Using SBM's trade secrets, Able became a JLL preferred supplier within approximately

two months.  As Mr. Somers testified, SBM was "the only supplier who had a preferred supplier

preference, and now there's two."  Id. at p. 190 lines 14-24.  The evidence also establishes that

_____

[3]Able argued, incorrectly, that there was no evidence that it had possession of any of
SBM's gap analyses.  To the contrary, at least some gap analysis is included in Exh. 63.

as a result of Able becoming a JLL preferred supplier, it was awarded a contract with Honeywell

with annual billings of between $5.4 and $6.9 million.  Declaration of Ken Silva [Doc. # 147]

(the "Silva Decl.") at ¶27.[4]  SBM unsuccessfully bid on the same JLL/Honeywell contract.  Id.

B.  Likelihood of Success on the Merits

SBM asserts that Garrett and Able have violated the Colorado Uniform Trade Secrets Act

by using SBM's confidential trade secret information, including particularly its pipeline.  Under

Colorado law, trade secrets include "confidential business or financial information, listing of

names, addresses, or telephone numbers, or other information relating to any business or

profession which is secret and of value."  Section 7-74-102(4), C.R.S.  In addition, "[t]o be a

'trade secret' the owner thereof must have taken measures to prevent the secret from becoming

available to persons other than those selected by the owner to have access thereto for limited

purposes."  Id.

The Colorado Uniform Trade Secrets Act defines "misappropriation" as:

> (a) Acquisition of a trade secret of another by a person who knows
> or has reason to know that the trade secret was acquired by
> improper means; or
>
> (b) Disclosure or use of a trade secret of another without express or
> implied consent by a person who:
>
> (I) Used improper means to acquire knowledge of the trade secret;
> or

---

[4]The Silva Declaration was submitted in connection with SBM's opposition to Garrett's motion for summary judgment.  See Silva Decl. [Doc. # 147] at caption.  A copy of the Silva Declaration was included as Exh. 122 among the exhibits provided in connection with the motions for preliminary injunction.  I will consider the Silva Declaration and its exhibits as a result of my exchange with SBM's counsel, Mr. Warne, during the injunction hearing. 3/25/2011 Trans. [Doc. # 327] at p. 233 line 21 through p. 251 line 21; p. 286 line 23 through p. 287 line 19.

(II) At the time of disclosure or use, knew or had reason to know that such person's knowledge of the trade secret was:

(A) Derived from or through a person who had utilized improper means to acquire it;

(B) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(C) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(III) Before a material change of such person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Section 7-74-102(2)(b), C.R.S.

Finally, a trade secret is acquired by "improper means" within the Colorado statute by "theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." Section 7-74-102(1), C.R.S.

In addition to the Colorado Uniform Trade Secret Act, Colorado courts have identified the following six-factor test for determining whether information warrants trade secret protection:

(1) the extent to which the information is known outside the business, (2) the extent to which it is known to those inside the business, i.e., by the employees, (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information, (4) the savings effected and the value to the holder in having the information as against competitors, (5) the amount of effort or money expended in obtaining and developing the information, and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

Porter Industries, Inc. v. Higgins, 680 P.2d 1339, 1341 (Colo. App. 1984). See Haggard v. Spine 2009 WL 1655030 at *7 (D. Colo. June 12, 2009)(quoting and applying Porter Industries).

Whether information constitutes a trade secret is a question of fact.  Harvey Barnett, Inc. v. Shidler, 338 F.3d 1125, 1129 (10th Cir. 2003)(citing Colorado Supply Co. v. Stewart, 797 P.2d 1303, 1306 (Colo. App. 1990).

Information can be a trade secret notwithstanding the fact that some of its components are well-known or publicly available.  Harvey Barnett, 338 F.3d at 1129; Haggard, 2009 WL 1655030 at *7.  In addition, "a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret."  Rivendell Forest Products, Ltd. v. Georgia-Pacific Corp., 28 F.3d 1042, 1045 (10th Cir. 1994)(internal quotation and citation omitted).  Detailed customer information may be a trade secret."  Xantrex, 2008 WL 2185882 at *18.

A difficulty in this case is identifying the trade secrets of SBM misappropriated by Garrett and Able.  SBM has presented evidence that Garrett took from SBM 68,000 documents totaling more than 530,000 pages, 3/25/2011 Trans. [Doc. # 327] at p. 133 lines 1-12, but it sweeps too broadly when it claims that they are all trade secrets.  SBM's chief financial officer, Ken Silva, identified in his declaration the following categories of documents which he asserts are entitled to trade secret status:

(1)    All documents in SBM's "knowledge portal," which he says "includes, but is not limited to SBM's processes, procedures, forms, and training materials";

(2)    SBM's responses to requests for information and requests for proposals, which include "SBM's internal due diligence, cost structures/business models, staffing plans/ assumptions, performance metrics, pricing and margins."  No documentary evidence of any of

SBM's responses to RFIs or RFPs was introduced, however.  Mr. Silva attached to his declaration (as Exhibit 5) only the request, not SBM's response;

(3)     SBM's detailed internal pricing documents which detail SBM's "business model, staffing plans/assumptions, metrics, pricing and margin information."  An example of the internal pricing documents was admitted into evidence as Exh. 103;

(4)     SBM's confidential sales history reports which include "prices quoted, accounts won or lost, and post mortem analyses."  An example of the confidential sales history reports was admitted into evidence as Exh. 63;

(5)     SBM company financial information, including financial statements, balance sheets, and income statements;

(6)     Internal senior management reports which "detail internal performance metrics and the monitoring of . . . service levels at a variety of locations."  An example of the senior management reports was admitted into evidence as Exh. 64; and

(7)     Images of "SBM's Proprietary Software Program Called Insite," which is a "real time performance management tool" that provides records of audits, complaints, work order histories, and performance measurements.  An example of an Insite image was admitted into evidence as Exhibit 101.  See Silva Decl. [Doc. # 147] at ¶¶15, 20.

I find that SBM has established that the following documents and the information contained within them include and/or constitute SBM's trade secrets:

(1)     The pipeline information, such as that contained in Exhs. 66, 67, 71, 124, and 149;

(2)     The internal SBM pricing information, such as that contained in Exh. 103;

(3)    The confidential sales history reports, such as Exh. 63;

(4)    The internal senior management reports, such as Exh. 64; and

(5)    The images from SBM's proprietary software program known as Insite, an

example of which is contained in Exh 101.

As to these documents, SBM has shown, and I find, that they constitute confidential

business information; confidential financial information; and/or confidential lists of customers

and potential customers.  In their compiled form, the information is not known outside of SBM,

and is known only by a limited number of SBM employees.  SBM takes reasonable precautions

to guard the secrecy of these materials, including limiting the number of people who have access

to the information and requiring those with access to sign confidentiality agreements, non-

compete and non-disclosure agreements, and similar contracts.  The evidence establishes that the

compilations of information contained in these documents took thousands of man-hours to

prepare, with the costs attendant to that effort, and duplication of the effort by Able from scratch

would likewise take thousands of hours.

I find further that Garrett used improper means to acquire these trade secrets.  Although

as an SBM employee he had the right to access the trade secrets, at a time when he was

contemplating resigning from SBM, and sometimes after he had already met with Able to

discuss employment, Garrett had his secretary gather SBM's trade secrets surreptitiously and

with the intention of taking them with him to his new employment.  This finding is supported by

the evidence that Garrett had his secretary gather "all available files from the 'knowledge

portal,'" Exh. 19; contact managers to obtain updated pipeline information, without disclosing

that the information was being gathered at Garrett's request, to avoid creating suspicion, Exh.

17

45; compile the "pipelines into one sheet," Exh. 28; and transmit the information to him on CDs so that it was readily portable.  Exh. 27.  All of this occurred at a time when Garrett was subject to a Confidentiality Agreement to "hold in confidence and to not disclose" SBM's trade secrets. Confidentiality Agreement [Exh. 58].

I find that Able acquired SBM's trade secrets from and through Garrett, knowing that Garrett owed a duty to maintain SBM's trade secrets.  This finding is supported by the email from Mark Kelly, of Able, to Garrett stating that Able "do[es] not want [Garrett] to bring anything with you from SBM."  Exh. E.

I am not persuaded by Able's argument that the misappropriated trade secrets have not been disseminated beyond Garrett to other Able employees.  There is evidence that SBM's trade secrets were found on Richard Mulkerrin's computer, see Exh. 71, and that SBM's trade secrets were provided by Garrett to other Able employees.  See Exh. 48.  In any event, where as here Garrett serves in an essentially identical position at Able as he held at SBM and is largely responsible for the generation of business, I find that Garrett does not have to transmit the information to anyone at Able for Able to use SBM's trade secrets.  See Xantrex, 2008 WL 2185882 at *19.

I find also that SBM's trade secrets were acquired by Garrett and Able by the improper means of Garrett breaching his Confidentiality Agreement and his duty to maintain the secrecy of SBM's confidential information.

Based on these findings, I conclude that SBM has made a strong showing of a substantial likelihood that it will succeed on the merits of its claim that Garrett and Able misappropriated SBM's trade secrets.

C.  Balance of Harms/Public Interest

A plaintiff seeking a preliminary injunction must show that the harm it will sustain

without the injunction outweighs the potential harm of the injunction to the defendants.  Here, I

have found that SBM has and is likely to continue to suffer irreparable harm if Garrett and

Able's use of SBM's trade secrets is not enjoined.  SBM has made a strong showing that the

harm to it resulting from of its trade secrets being in the hands of a direct competitor, including

its pipeline information about current and prospective clients, through the defendants' improper

means outweighs any possible harm to the defendants.

Nor does it appear that an injunction would result in any harm to the defendants.  To the

contrary, the defendants have argued that they have no interest in SBM's trade secrets.

Transcript of Proceedings, March 30, 2011 [Doc. # 352] (the "3/30/2011 Trans.") at p. 32 lines

3-10; Garrett's Response [Doc. # 234] at p. 2.  In addition, here as in Xantrex, I find that the

potential harm to Garrett and Able of an injunction to preclude their use of misappropriated trade

secrets "merits little equitable consideration and is insufficient to outweigh" the continued

misappropriation.  2008 WL 2185882 at * 16 (citing Autoskill, Inc. v. Nat'l Education Support

Systems, Inc., 994 F.2d 1476, 1498 (10th Cir. 1993)).

Finally, I find that a preliminary injunction prohibiting Garrett and Able's possession and

use of SBM's trade secrets will not adversely affect the public interest.

D.  Security Under Rule 65(c), Fed. R. Civ. P.

Rule 65(c), Fed. R. Civ. P., requires:

> The court may issue a preliminary injunction . . . only if the
> movant gives security in an amount that the court considers proper
> to pay the costs and damages sustained by any party found to have
> been wrongfully enjoined. . . .

I have "wide discretion" in determining whether to require security and in what amount.

Winnebago Tribe of Nebraska v. Stovall, 341 F.3d 1202, 1206 (10th Cir. 2003).

Neither side presented any evidence or meaningful argument about the amount of an appropriate bond. A bond is unnecessary absent proof of a likelihood of harm to the defendants. Id. See Kirstin Stoll-DeBell, Nancy L. Dempsey, and Bradford E. Dempsey, INJUNCTIVE RELIEF: TEMPORARY RESTRAINING ORDERS AND PRELIMINARY INJUNCTIONS 312 (2009)(noting that "[a]s a practical matter, the burden is on the party opposing a preliminary injunction to provide evidence of the damages it will suffer if wrongfully enjoined so that the court may make an informed decision as to the appropriate amount of the bond"). I have found that the defendants will not suffer any harm as a result of the injunction. Consequently, there is no need for a bond.

## IV.

IT IS ORDERED:

(1)     The Motion for Injunction: Garrett [Doc. # 173] is GRANTED;

(2)     The Motion for Injunction: Able [Doc. # 259] is GRANTED;

(3)     Garrett, Able, their officers, agents, servants, employees, and attorneys, and all other persons who receive actual notice of this Order and Preliminary Injunction who are in active concert or participation with Garrett, Able, and/or their officers, agents, servants, employees, and attorneys, are preliminarily enjoined from possessing, using, disclosing, reviewing, or accessing, directly or indirectly, any of the following SBM trade secrets: (i) pipeline information; (ii) internal SBM pricing information; (iii) confidential sales history reports; (iv) internal senior management reports; and (v) images from SBM's proprietary

software program known as Insite;

(4)     To the extent they have not already done so, the defendants and their officers, agents, servants, employees, and attorneys shall immediately return any and all (i) pipeline information; (ii) internal SBM pricing information; (iii) confidential sales history reports; (iv) internal senior management reports; and (v) images from SBM's proprietary software program known as Insite to SBM, in whatever form such information exists including any and all documents, electronic information, and copies thereof that are currently in their possession, custody, or control; shall delete their ability to access any electronic information containing any of the identified trade secrets; and shall certify to the court, in writing and under oath on or before **July 1, 2011,** the steps taken to comply with the requirement to return and delete their access to SBM's trade secret information; and

(5)     No security shall be required.

Dated June 13, 2011.

BY THE COURT:

 s/ Boyd N. Boland
United States Magistrate Judge